UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

WILLIAM MILLS,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )        1:13-cv-00044-SEB-DKL
                                        )
HAUSMANN-MCNALLY, S.C.,                 )
                                        )
                Defendant.              )


## ORDER ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on two motions for summary judgment: Plaintiff William

Mills's Motion for Partial Summary Judgment on Defendant's first affirmative defense [Docket

No. 44], filed on September 19, 2013, and Defendant Hausmann-McNally, S.C.'s Motion for

Partial Summary Judgment [Docket No. 62], filed on December 9, 2013. For the reasons set

forth below, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## Facts[1]

These motions for summary judgment arise out of a legal malpractice action, which in

turn arises out of a personal injury claim. Plaintiff William Mills, the personal injury claimant,

sued his former counsel, Defendant Hausmann-McNally S.C. ("Hausmann-McNally") for legal

malpractice. Hausmann-McNally, in turn, has asserted as an affirmative defense to the

malpractice claim that a non-party—namely Plaintiff's present counsel, Price Waicukauski &

---

[1] Portions of this summary of the facts draw from the parties' submissions in conjunction with prior motions.
Citations to Docket Nos. 30, 38, and 47 refer to the parties' briefs on Defendant's motion to disqualify counsel
[Docket No. 29]. Citations to Docket Nos. 16, 18, and 19 refer to Plaintiff's motion to dismiss Defendant's third-
party claims against PWR [Docket No. 15].

Riley, LLC ("PWR")—is responsible in whole or in part for any legal malpractice that Hausmann-McNally may have committed. *See* Docket No. 9 at 6.

**1. The Personal Injury Suit**

Larry Mills was injured in a traffic accident on October 10, 2008 when his motorcycle was struck by another vehicle at an intersection on State Road 37 in rural Lawrence County, Indiana. Compl. ¶¶ 5–6.[2] The driver of the other vehicle was Hannah Nelson,[3] an employee of the Hoosier Uplands Development Corporation, who at the time of the accident was driving on an errand related to her employment with that agency. *Id.* at ¶¶ 7–8. After the accident, Ms. Nelson was interviewed by police; she stated that she was the owner of the vehicle, and she provided her personal insurance information. The crash report created by the investigating police officer states that Nelson used the vehicle for "PERSONAL (FARM, COMPANY)" purposes. Docket No. 31, Ex. A at 3. Shortly thereafter, Mr. Mills retained the law firm of Hausmann-McNally to represent him in claims against "all liable parties" to seek recovery for his injuries; Indiana attorneys Rodney A. Tucker and Christopher Moeller handled the representation of Plaintiff's interests within Hausmann-McNally. Tucker Dep. 132–133; Moeller Decl. ¶ 5.[4] Larry Mills died in February 2012, and Plaintiff William Mills now serves as the representative of the decedent's estate. Compl. ¶ 2.

Shortly after agreeing to represent Plaintiff, Hausmann-McNally contacted Farm Bureau Insurance, Ms. Nelson's personal automobile insurer. On November 6, 2008, Farm Bureau sent Hausmann-McNally copies of Ms. Nelson's insurance policy and a declarations page. The

---

[2] Citations to the Complaint ("Compl.") refer to the malpractice complaint filed by Plaintiff against Hausmann-McNally [Docket No. 1].

[3] Hannah Nelson was formerly known, at the time of the accident, as Hannah Brooking; some documents in the record refer to her by that name. We name her "Nelson" throughout to minimize confusion.

[4] Tucker was the more senior attorney, and he characterized Moeller as the primary day-to-day "file handler" for the case. Tucker Dep. 132–133. Moeller, however, has asserted that Tucker held principal responsibility, as the firm's head attorney for personal injury matters in the Indianapolis area. Moeller Decl. ¶ 5.

declarations page stated that Nelson's vehicle "is driven to and from work 150 miles or less each week." Pl.'s Ex. 13 at 5. In preliminary negotiations with Nelson's insurer pursuant to the personal injury claim, Hausmann-McNally discovered that the limit of her personal automobile insurance policy was $50,000—significantly less than the amount of damages Plaintiff planned to seek. Hausmann-McNally did not make any further inquiries about Ms. Nelson's employment status or the possibility of recovering from her employer. Instead, Hausmann-McNally made demand on Farm Bureau for the full $50,000, and Farm Bureau agreed to settle on May 13, 2009 for that amount. Farm Bureau provided Hausmann-McNally with a release, and ordered a $50,000 draft, to be paid to Plaintiff and counsel.[5] Docket No. 45 at 7 (citing Pl.'s Ex. 12 at 1).

Because his damages exceeded the settlement amount, Mr. Mills expressed interest in the possibility of recovering from other entities, such as the manufacturer of his motorcycle helmet and the state agencies responsible for designing the intersection where the accident occurred. To facilitate this expansion of the scope of the case, Mr. Mills retained PWR on October 19, 2009. Docket No. 63 at 3, ¶ 12; Docket No. 45 at 8–9. The parties differ in their recounting of the scope of PWR's representation. According to Hausmann-McNally, PWR took on the role of lead counsel for all of Mr. Mills's potential claims. Docket No. 30 at 4 ("PWR served as lead counsel in the litigation"). PWR, in contrast, asserts that it was retained only to pursue the new causes of action, and that it had no role in the original claim against Ms. Nelson. Docket No. 45 at 8–10.

The parties also differ in how they explain what happened next. It is undisputed that Hausmann-McNally, at least nominally, remained on as co-counsel after Plaintiff hired PWR. It is also undisputed that PWR filed complaints against Hannah Nelson and others on Plaintiff's behalf. PWR attorneys William Riley and Joseph Williams filed a complaint in Marion County

---

[5] A dispute arose later over whether Hausmann-McNally had ever received this draft, and thus whether the settlement was finalized.

Superior Court on April 21, 2010, alleging negligence against Hannah Nelson and products liability against the helmet manufacturer. Docket No. 31, Ex. C. Two days later, the same PWR attorneys filed an amended complaint on Plaintiff's behalf, adding an additional count against the helmet manufacturers. Docket No. 31, Ex. D. Finally, on July 14, 2010, PWR filed a second amended complaint on Plaintiff's behalf, adding a fourth count against Lawrence County and INDOT for negligence in designing and constructing the intersection where the crash occurred. Docket No. 31, Ex. E. As in the two previous iterations of the Marion County Superior Court complaint, the count against Hannah Nelson alleges negligence only in her personal capacity; it does not mention her employer at all, let alone the fact that her employer was a state agency. *Id.* at 3.

What is disputed is *why* Plaintiff, by counsel, filed these personal injury complaints in state court. In PWR's telling, PWR discovered—in the course of preparing for its products liability suit against the helmet manufacturer—that the March 2009 $50,000 settlement check from Ms. Nelson's insurer was not actually in Hausmann-McNally's possession; it also learned around the same time that photographs of the scene crucial to the products liability claim were in Farm Bureau's possession. Docket No. 45 at 12. PWR explains that it named Ms. Nelson as a Defendant in order to enforce the earlier settlement agreement and to obtain an agreement from Farm Bureau to produce those photographs—in other words, the inclusion of Ms. Nelson was largely incidental to their pursuit of the products liability claim. *Id.*

Hausmann-McNally remembers differently. According to its account, "there was significant confusion about the status of the Hannah Nelson claim well after PWR entered the case, and ample evidence to support the inference that the claim had not yet been settled . . . ." Docket No. 47 at 5. In sum, Hausmann-McNally asserts that PWR, as the new lead counsel for

Plaintiff, filed suit against Ms. Nelson not as an afterthought, but so that it could, for the first time, secure payment up to the policy limit from Ms. Nelson's insurer. *Id.* at 4–6.[6]

In either event, Ms. Nelson's counsel quickly reached a settlement agreement with Plaintiff, but the products liability suit proceeded. In the course of discovery on that claim, PWR, acting on Plaintiff's behalf, deposed Hannah Nelson as a witness on September 18, 2012. Docket No. 45 at 13–14. During this deposition, Ms. Nelson revealed that she was acting within the course and scope of her employment with the Hoosier Uplands Development Corporation ("Hoosier Uplands") at the time of the accident. Docket No. 31, Ex. F. Hoosier Uplands is a "Community Action Agency," and is therefore considered a "political subdivision" of the State of Indiana for the purposes of the Indiana Tort Claims Act. Ind. Code § 34-13-3-8. Under Indiana law, a prospective plaintiff intending to sue a political subdivision of the state for damages must provide written notice to the defendant agency outlining the nature of the claim and damages within 180 days of the injury. *See* Ind. Code § 34-13-3-8(a). If a prospective plaintiff fails to provide this notice, he is permanently barred from bringing the claim. *Id.* As of September 18, 2012, when Ms. Nelson was deposed and PWR discovered that the procedural bar applied, the 180-day notice period for any claim by Plaintiff against the state agency had long since run. For the accident occurring in October 2008, notice would have been required by April 2009—some six months before PWR was retained in October 2009.

## 2. The Malpractice Suit

---

[6] In its response to Plaintiff's motion for partial summary judgment, Defendant enumerates a number of what it characterizes as material facts in dispute on the question of the scope of PWR's representation of Plaintiff with respect to the negligence claim against Hannah Nelson—and the question of whether the negligence claim was settled or thought to be settled as of October 2009. *See* Docket No. 58 at 3–6, ¶¶ 1–18. We do not address this dispute in detail because it is not material to our disposition of Defendant's affirmative defense. *See below.*

After deposing Ms. Nelson, an attorney with PWR contacted Mr. Tucker—Plaintiff's primary counsel with Hausmann-McNally—and informed him that since the car accident had been caused by a state agency employee acting within the scope of employment, the 180-day notice period applied. *Id.* at ¶ 21. According to PWR, Mr. Tucker responded: "Your case just got easier. You have a client to call, and you need to sue us for malpractice." *Id.* at ¶ 22. Shortly after this deposition, Hausmann-McNally withdrew as Plaintiff's co-counsel; on October 16, 2012, the Marion County Superior Court granted Hausmann-McNally's motion to withdraw in the pending personal injury suit before that court. Docket No. 38 at 14.

Plaintiff subsequently made demand on Hausmann-McNally for its alleged malpractice in allowing the 180-day notice deadline to lapse, thus denying Plaintiff any prospect of recovery from the Hoosier Uplands Development Corporation for the injury caused by the agency's employee. *Id.* at ¶¶ 24–28. When Hausmann-McNally denied any liability, Plaintiff sued Hausmann-McNally for malpractice, filing its complaint with this Court on January 9, 2013. *See* Docket No. 1. In its answer, filed on March 4, 2013, Hausmann-McNally continued to deny that it had committed malpractice, and it asserted three affirmative defenses. Docket No. 9. Defendant's first affirmative defense was that PWR was a non-party wholly or partly responsible for any malpractice Hausmann-McNally may have committed. *Id.* at 6, ¶ 1. In the alternative, it also filed a third party complaint against PWR, seeking recovery on indemnity and contribution theories in the event that Hausmann-McNally is found liable to Plaintiff. Docket No. 9. Hausmann-McNally also filed a motion to disqualify counsel on July 3, 2013. *See* Docket No. 29.

The Court dismissed Defendant's third-party complaint against PWR for indemnification and contribution in an order dated January 14, 2014. Docket No. 69. The Court also dismissed

Defendant's motion to disqualify counsel the same day. Docket No. 70. Plaintiff moved for partial summary judgment on Defendant's first affirmative defense on September 19, 2013, *see* Docket No. 44, and Defendant filed its cross motion for partial summary judgment on the same issue on December 9, 2013, *see* Docket No. 62.

## Legal Analysis

### Standard of Review

The Federal Rules of Civil Procedure provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

### Discussion

The cross motions for summary judgment that are before us concern Defendant's first affirmative defense to Plaintiff's legal malpractice claim, which asserts that "a nonparty, PWR, is at fault, in whole, or in part, for the damages as claimed by the Plaintiff." Docket No. 9 at 6, ¶ 1. In support of this defense, Defendant makes four interrelated arguments: (1) that the six-month ITCA notice deadline did not lapse in April 2009 because Hoosier Uplands would have been estopped from asserting it as a bar to suit, (2) PWR did not represent Plaintiff in a limited capacity when it joined the case in October 2009, but rather owed Plaintiff a duty of care with respect to all aspects of the case, including the negligence suit against Hannah Nelson, (3) the negligence suit against Hannah Nelson was not yet settled for at least part of the time that PWR represented Plaintiff, and (4) that PWR therefore had the ability to sue Hoosier Uplands before the two-year statute of limitations for such suits expired in October 2010, but negligently did not. Docket No. 63 at 2.

Unless Defendant can show that the ITCA's notice requirement did not bar any suit against Hoosier Uplands initiated more than six months after the injury took place, it cannot prevail on its affirmative defense, and its other arguments are immaterial and unavailing. The collision in which Larry Mills was injured occurred on October 10, 2008; Plaintiff did not retain PWR until approximately a year later, in October 2009. *See* Docket No. 63 at 2–3. If compliance with the ITCA's notice provision was not excused, then the six month deadline expired while Hausmann-McNally—and only Hausmann-McNally—served as Plaintiff's counsel and owed Plaintiff a duty of care. Because we conclude that the notice deadline would have time-barred any suit against Hoosier Uplands filed after April 2009, Defendant's first affirmative defense fails as a matter of law.

## I.     The ITCA and Equitable Estoppel

The Indiana Tort Claims Act (ITCA) provides that "a claim against a political subdivision is barred unless notice is filed . . . within one hundred eighty (180) days after the loss occurs." Ind. Code § 34-13-3-8(a). A "loss" is deemed to occur from the moment when the plaintiff knew, or should have known, "that an injury had been sustained as a result of the tortious act of another." *Waldrip v. Waldrip,* 976 N.E.2d 102, 110 (Ind. Ct. App. 2012) (quoting *Reed v. City of Evansville,* 956 N.E.2d 684, 691 (Ind. Ct. App. 2011)). The purpose of the Act's notice provision is to afford municipal authorities the opportunity to investigate the facts surrounding an accident while the facts are still fresh and available. *See Johnson v. Consol. Rail Corp.*, 565 F. Supp. 1025, 1027 (N.D. Ind. 1983). It is indisputable here that Plaintiff's loss occurred on October 10, 2008. Docket No. 45 at 5; Docket No. 63 at 2, ¶ 1. Defendant concedes that it did not file notice of a claim against Hoosier Uplands within 180 days of the accident's occurrence.[7] Nevertheless, Defendant argues that suit against Hoosier Uplands would still have been possible even at a later date—after PWR began its representation of Plaintiff—because Nelson and Hoosier Uplands would have been estopped from relying on the ITCA's notice provision. *See* Docket No. 63 at 9; Docket No. 58 at 11–19.

In its decision last year in *Schoettmer v. Wright,* 992 N.E.2d 702 (Ind. 2013), the Indiana Supreme Court recognized that equitable estoppel may prevent a state entity from relying on the ITCA's notice requirement as a defense to a tort claim. For a plaintiff to claim equitable estoppel, however, he must show his: "(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change his position prejudicially." *Schoettmer,* 992 N.E.2d at

---

[7] Hausmann-McNally did, on Plaintiff's behalf, file on October 31, 2008 a timely notice of tort claim against state, county, or city agencies entities responsible for "maintenance, signage, traffic signals, and design" of the intersection where the accident occurred. Docket No. 31, Ex. B at 2 (Notice of Tort Claim).

709 (quoting *Story Bed & Breakfast LLP v. Brown Cnty. Area Plan Comm'n*, 819 N.E.2d 55, 67 (Ind. 2004)). The doctrine of estoppel derives from one core "underlying principle": the equitable intuition that "one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Town of New Chicago v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010); (citing *Brown v. Branch,* 758 N.E.2d 48, 51 (Ind. 2001)). Because the Indiana courts have long recognized a general rule against applying equitable estoppel to government authorities, *see Story Bed & Breakfast,* 819 N.E.2d at 67 (citing *City of Crown Point v. Lake County,* 510 N.E.2d 684, 687 (Ind. 1987)), the state "will not be estopped in the absence of clear evidence that its agents made representations upon which the party asserting estoppel relied." *Id.*; *Ind. Dep't of Envtl. Mgmt. v. Conard,* 614 N.E.2d 916, 921 (Ind. 1993). The party asserting estoppel bears the burden of providing such clear evidence. *Schoettmer,* 992 N.E.2d at 709.

The facts of *Schoettmer* help illustrate when equitable estoppel may apply to an ITCA notice defense. The plaintiff, John Schoettmer, was injured in an auto accident by the defendant, who was an employee of South Central Community Action Program ("South Central"), a governmental entity subject to the ITCA. 992 N.E.2d at 704–705. Both parties conceded that the defendant was acting in the scope of her employment, and the plaintiff was aware from the earliest stages of the litigation that the defendant worked for the South Central Community Action Program[8]; the plaintiff was *not* initially aware, however, that South Central was an entity subject to the ITCA. *Id.* at 705. Some 10 months after the accident, and after preliminary settlement discussions had broken down, Schoettmer retained counsel for the first time and

---

[8] Schoettmer engaged in communications with South Central's insurer, and was thus presumably aware of the existence of South Central and its status as the defendant's employer. 992 N.E.2d at 705.

subsequently sued the defendant and South Central. *Id.* The defendants' first answer made no mention of the ITCA notice provision, but they later added an affirmative defense citing the plaintiff's failure to give notice under the ITCA—well more than two years after the accident had occurred. *Id.* The Indiana Supreme Court found the three prerequisites of equitable estoppel satisfied: (1) neither the insurance agency nor the agency gave the plaintiff "any reason to believe" that South Central was covered by the ITCA; (2) the defendants' agent made affirmative representations to the plaintiff that "it would be in his best interest to wait until he is released from treatment"—i.e., more than 180 days—before he should try to settle the claim; and (3) the plaintiff acted in reliance on those representations, in that he waited until five months after the accident to sign a release of his medical records, and the agency did not respond with a settlement offer until the ITCA notice period had already run. *Id.* at 709. For these reasons, the *Schoettmer* court found that summary judgment against the plaintiff on his estoppel claim was unwarranted. *Id.* at 710.

## II.     Application of Equitable Estoppel to This Case

We conclude that Defendant has failed to demonstrate that equitable estoppel would have barred an ITCA defense to a suit filed after April 2009. It has demonstrated neither that it lacked "knowledge or the means of knowledge" that Hannah Nelson was the employee of a state agency, nor that it relied to its detriment on representations made by Hoosier Uplands or its agent Nelson.

### A. "Knowledge or means of knowledge"

Defendant argues that it was excusably unaware of Nelson's status as a state agency employee "because there was nothing to suggest that she had such employment." Docket No. 58 at 17. According to Defendant, Nelson never told Plaintiff or the investigating police officer at

the scene that she was driving in the scope of her employment or that her employment was with a state agency. Docket No. 63 at 2, ¶ 4. The police officer's crash report, filled out the day of the accident, showed that Nelson was the owner of the vehicle and listed her personal insurer. Docket No. 31, Ex. A. Plaintiff retained Hausmann-McNally 10 days after the accident, and the firm sent a letter to Nelson's insurer on October 22, 2008—two days after being retained— seeking information on her insurance policy. Pl.'s Ex. 12. Nelson's insurer responded on November 6, 2008; the response included a "declaration" stating that "[t]his vehicle is driven to and from work 150 miles or less each week." Pl.'s Ex. 7 at 5. Hausmann-McNally made a settlement demand of Nelson's insurer on February 2, 2009, seeking repayment in the amount of Nelson's policy limit of $50,000. Pl.'s Ex. 9. The firm's case notes show that this initial contact with Nelson's insurer was the only time in the six months after the accident that Hausmann-McNally attempted to get in touch with Nelson, her insurer, or employer; Defendant has designated no evidence indicating that anyone with Hausmann-McNally ever inquired about Nelson's employment status. *See* Pl.'s Ex. 8.[9]

We can assume that Hausmann-McNally lacked *actual* knowledge that Nelson worked for a state agency; Defendant falls short, however, of establishing that the firm lacked "means of knowledge." *See Story Bed & Breakfast,* 819 N.E.2d at 67. The plaintiff in *Schoettmer* acted without the assistance of counsel; though he knew who the defendant worked for, he did not know that that employer was a governmental agency subject to the ITCA. *Schoettmer,* 902

---

[9] In fact, Defendant has designated no evidence *at all* in relation to either of the two summary judgment motions, save an affidavit by Christopher Moeller. The Moeller affidavit concerns only the separate question of the scope of PWR's representation once it entered the case in late 2009; it contains no assertions regarding Defendant's estoppel argument. *See* Docket No. 63, Ex. 1; Docket No. 68, Ex. A (amended affidavit). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). While we do engage in a full discussion of the issues raised by Defendant's briefs here, we note that Defendant's failure to designate evidence pursuant to Rule 56(e) would serve as an independent basis for a ruling in favor of Plaintiff on Plaintiff's summary judgment motion. *See id.* (citing *Matsushita,* 475 U.S. at 585–587 (1986)).

N.E.2d at 705. Here, by contrast, Plaintiff was represented by a law firm for nearly the entire period before the 180-day notice period lapsed. *See* Pl.'s Ex. 8. Hausmann-McNally knew that Nelson used her car to drive to and from work; perhaps more significantly, it knew that its client's injuries far exceeded Nelson's personal policy limits. Under these circumstances, no reasonable fact-finder could determine that the firm lacked the means even to discover the name of Nelson's employer. *Cf. Terra Nova Dairy, LLC v. Wabash Cnty. Bd. of Zoning Appeals,* 890 N.E.2d 98, 105 (Ind. Ct. App. 2008) (party could not claim it lacked "means of knowledge" where it would have discovered upon inquiry that a local ordinance had been amended). Had it inquired into the name of Nelson's employer, it would have been at least on inquiry notice that the "Hoosier Uplands Economic Development Corporation" might be a government entity. *See Fowler v. Brewer,* 773 N.E.2d 858, 866 (Ind. Ct. App. 2002) (holding that a plaintiff cannot claim estoppel where he was on inquiry notice of the government employee's status); *Brunton v. Porter Memorial Hosp. Ambulance Serv.*, 647 N.E.2d 636, 640 (Ind. Ct. App. 1994) (noting that there is no equitable estoppel where plaintiff cannot claim she was "somehow mis[led] into believing" that the defendant was not part of a government entity).[10]

Indiana's courts have "been hesitant to allow an estoppel in those cases where the party claiming to have been ignorant of the facts had *access* to the correct information." *Story Bed & Breakfast,* 819 N.E.2d at 67 (emphasis added); *Cablevision of Chi. v. Colby Cable Corp.*, 417 N.E.2d 348, 355 (Ind. Ct. App. 1981). "Where each party has equal knowledge, or means of knowledge, of all the facts, there is no estoppel." *Terra Nova Dairy,* 890 N.E.2d at 105 (quoting

---

[10] Defendant's only retort on the question of its "means of knowledge" is to assert that "neither H-M nor any claimant's attorney has any ability to compel a prospective defendant to discuss anything." Docket No. 63 at 13. Defendant's reliance on its inability to *coerce* Nelson into divulging information would be more convincing if the record indicated it had engaged in any attempt to discover the information. *See Barnd v. Borst,* 431 N.E.2d 161, 166 (Ind. Ct. App. 1982) ("Consistent with the doctrine of equitable estoppel, appellant is charged with whatever knowledge she could have acquired in the exercise of ordinary diligence.").

*N. Ind. Pub. Serv. Co. v. Stokes,* 595 N.E.2d 275, 279 (Ind. Ct. App. 1992)). *See also City of Crown Point,* 510 N.E.2d at 687 ("Estoppel cannot be applied if the facts are equally known by or accessible to both parties"). Defendant has not demonstrated that this is a case triggering the equitable doctrine's protective concern for those who have been misled and cannot reasonably be expected to discover the facts for themselves.

**B. Reliance**

Equitable estoppel is a bulwark for fundamental fairness against intentional deception; it applies if "one party, through its representations or course of conduct, knowingly misleads or induces another party to believe and act upon his or her conduct in good faith and without knowledge of the facts." *See Purdue Univ. v. Wartell,* 5 N.E.3d 797, 807 (Ind. Ct. App. 2014); *American Family Mut. Ins. Co. v. Ginther,* 803 N.E.2d 224, 234 (Ind. Ct. App. 2004) (further citations omitted).

Defendant contends that it can show justifiable reliance because "[Nelson], who was acting as a representative of Hoosier Uplands, provided no information to suggest that she was a government employee. Undoubtedly, H-M relied upon the nature of Brooking's representations to the investigating officer in making the conscious decision to file notices of tort claim against a variety of governmental entities but not against Hoosier Uplands." Docket No. 58 at 18. But Defendant has pointed to no evidence that Nelson, or Hoosier Uplands or its other agents, made any intentional misrepresentations upon which Mills and his counsel Hausmann-McNally relied to their detriment. The only representation of any kind made by Nelson of which we have a record is the police crash report that presumably reflects statements to a police officer; Defendant does not assert that the report contains any inaccuracies, or even any omissions—the form has no

blanks for a driver's employment information or status as a government worker.[11] Docket No. 31, Ex. A. *Cf. Town of New Chicago,* 939 N.E.2d at 653 ("[S]ilence will not form the basis of an estoppel unless the silent party has a duty to speak.").

There are two representations within the report on which Defendant asserts it relied. First, Nelson supplied her personal insurance information. Docket No. 31, Ex. A at 3. Second, in the blank marked "Vehicle Use," the officer typed: "PERSONAL (FARM, COMPANY)."[12] *Id.* Though the use of the term "personal," in isolation, could have painted a misleading picture, the parenthetical clarification that Nelson meant "personal" to include business purposes—"farm, company"—renders the statement at least accurate, if perhaps not exhaustive. Any confusion the police report may have engendered regarding whether the car was used for business purposes should have been dispelled shortly thereafter by the insurance company's declaration that Nelson drove the car to and from work—information that would lead a reasonable observer to at least suspect that Nelson might be engaged in work in the early afternoon of a weekday, when the accident occurred. *See* Pl.'s Ex. 7 at 5. This is a far cry from the facts of *Schoettmer,* where the state agency's insurer urged the plaintiff to delay taking action on his claim—a delay that the plaintiff showed directly contributed to his failure to meet the ITCA's notice deadline. *See Schoettmer,* 992 N.E.2d at 709. Moreover, the inferences that can be drawn with respect to intent

---

[11] As Plaintiff points out, the status of the crash report as a "representation" made by Nelson to Mills is questionable. "Party A must have made false representations or concealed material facts . . . . The representations must have been made to party B, with the intent to induce B's reliance on those statements." *Kokomo Veterans, Inc. v. Schick,* 439 N.E.2d 639, 643 (Ind. Ct. App. 1982) (citing *Justice v. Mid-State Homes,* 257 N.E.2d 843 (Ind. Ct. App. 1970)).

[12] The word "company" carries with it two potential ambiguities. First, it could be (though implausibly in the context in which it is used here) interpreted as meaning "other people"—i.e. "I use the car to haul company around." Second, it might imply that Nelson, though she used the car for work, worked for a *private* company rather than a government agency. We find it more likely that Nelson—or the officer who typed up the report—meant "company" as a simple synonym for "business"; this is especially conceivable since Nelson's employer, though a state agency, is styled a "corporation." Regardless, Defendant does not mention this particular issue, other than to state more broadly that Nelson's assertion it was a "personal" vehicle was misleading. We do not find that Nelson's (or the police officer's) statement, taken as a whole and in context with the other information that Defendant possessed, can be reasonably construed as an intentional misrepresentation that induced detrimental reliance.

15

are particularly at variance with *Schoettmer* here. The only representations that Nelson made were to an investigating police officer, not Mills; there is no reason to believe that in answering police questions Nelson intended to induce detrimental reliance in a third party. *Cf. Kokomo Veterans, Inc. v. Shick,* 439 N.E.2d 639, 643 (Ind. Ct. App. 1982) (noting that party A's representations, to give rise to estoppel, must have been "made to party B, with the intent to induce B's reliance on those statements").

Defendant has presented no affirmative evidence that it relied to its detriment on Nelson's representations—such as they were. Rather, it points to the fact that it *did* file timely notices of tort claims against other state entities and asks us to assume that it would have done likewise for a claim against Hoosier Uplands had it not been justifiably ignorant of Nelson's employment status. *See* Docket No. 58 at 17–18. As PWR points out, however, there *is* evidence in the record suggesting that the proximate cause of Hausmann-McNally's failure to meet the deadline was a lapse in diligence, perhaps caused by confusion among its attorneys. Rodney Tucker, a Hausmann-McNally attorney who represented Mills during the time period in question, *see* Pl.'s Ex. 7,[13] testified as follows:

> Q: So at least according to the police report, the accident took place during a weekday during working hours, more or less?
>
> [Tucker]: Well, unless she's at lunch.
>
> Q: Okay. Should the date, day of the week, and time in your opinion as a lawyer give some, give a lawyer any reason to suspect that Ms. Brooking was working at the time her vehicle struck Larry Mills?
>
> [Tucker]: I think that's – it's, it's a – I don't know if it would reach that level, but I think it's at least something that would cause, should cause you to ask the question.

---

[13] Hausmann-McNally has stated that "Mr. Tucker has information concerning his and Defendant's representation of Plaintiff." Pl.'s Ex. 7 (Hausmann-McNally initial disclosures). Plaintiff has pointed to a large number of documents in the record reflecting Tucker's involvement in the case. *See* Docket No. 45 at 4 n.2 (citing Pl.'s Exs. 2, 3, 4, 5, 7, 11, 12, 13, 14).

…

Q: So in your opinion based on the timing and the day of the week and the date that's on this crash report, it should have triggered for the file handler some reason to follow up and say, hey, was she working at the time?

[Tucker]: I, I think that that's something you should do anyway, whether – I mean, with this kind of injury, I'm going to be honest, I think that, that the file handler, whoever's doing it, the file handler should ask that question because the person could be working a graveyard shift on a – I don't know. But honestly, yes, the file handler should be looking at that question.

. . .

Q: Whether or not you look at the police report or the declarations page [from the insurer], you would agree with me that the file handler had the responsibility to determine if Hannah [Nelson] was acting within the course and scope of her employment when she struck Larry Mills.

[Tucker]: I think that's one of the things they should have known, yes.

Tucker Dep. 160–164. As the tenor of his testimony might indicate, Tucker denied that he was the "file handler" responsible for the failure to look into Nelson's employment status in a timely manner. Instead, he asserted that Christopher Moeller, a more junior attorney with Hausmann-McNally, had had day-to-day responsibility for Mills's personal injury case. *Id.* at 132–133. For his part, Moeller points the finger back at Tucker, declaring that "Mr. Tucker [held] primary responsibility for the handling of Mr. Mills's injury case. I assisted Mr. Tucker in some limited capacity with client contact." Moeller Decl. ¶ 5. Neither attorney stated that the firm failed to discover Nelson's employment status because it had been misled by her or her insurer.[14] *See City*

---

[14] Mr. Tucker did assert his opinion that "there are ways of getting around the Tort Claim [sic] Act" if "you had failed to [investigate] or if you don't know that she was working for a government-type entity and somebody hid that." Tucker Dep. 138. In the very same statement, however, he went on to say that "if there had been a failure at some point, then it could have been fixed and *apparently wasn't* in my opinion." *Id.* Tucker never argued that Nelson had "hidden" her employment status; in fact, he ventured (without saying so explicitly because he maintained that it had not been his responsibility) that the firm had fallen short of its "duty to investigate." *Id.*

*of Crown Point,* 510 N.E.2d at 687 (declining to find estoppel where internal confusion caused a plaintiff's failure to engage in proper "vigilance").

Regardless of whether Hausmann-McNally failed to submit timely notice under the ITCA because it believed in good faith that Nelson was not an employee or a state agency, or because its attorneys simply failed to inquire into the question diligently, Defendant has offered no evidence consistent with the notion that it failed to act in reliance on misrepresentations offered by the state entity or its agents.

## III.   Defendant's arguments

### A. *Gregor* and *Baker*

While Defendant does not expressly challenge the applicability of the equitable estoppel framework we have applied above, its principal counterargument is that the Court should look to the results of two decisions—*Gregor v. Szarmach,* 706 N.E.2d 240 (Ind. Ct. App. 1999), and *Baker v. Schafer,* 922 F. Supp. 171 (S.D. Ind. 1996)—as decisive here. In *Gregor,* the Indiana Court of Appeals ruled that an individual defendant in an auto-accident personal injury suit could not assert the plaintiff's failure to comply with the ITCA as an affirmative defense where neither the defendant's clothing nor his vehicle indicated he was a government employee, he provided his personal insurance information, and he made no representations at the scene disclosing his status. 706 N.E.2d at 243. In reaching this result, *Gregor* relied heavily on the Southern District of Indiana's decision in *Baker,* which had held that "a government employee in the course of his duties who acts in a way disguising his status as such may not enjoy the benefits of that status under the ITCA if the plaintiff actually and reasonably lacks knowledge of the status." *Baker,* 922 F. Supp. at 174.

*Gregor* and *Baker* undoubtedly bear a distinct factual resemblance to the case before us. We nonetheless conclude that their holdings are not as persuasive here as the circumstantial similarities would suggest, for two reasons. First, both were teed up in a way that rendered their equitable balance different from this case. In both *Baker* and *Gregor,* the plaintiff had sued the *individual* responsible for an auto accident, who then claimed that the ITCA notice provision protected him from personal liability. The *Baker* court noted that such a result would be "unjust," and it declined to "provide [the defendant] any relief" by virtue of the ITCA.[15] 922 F. Supp. at 173. *See also* 706 N.E.2d at 242. In our case, by contrast, Plaintiff *did* sue Hannah Nelson for negligence, and she settled without seeking refuge in the ITCA; the malpractice which Plaintiff now alleges is Hausmann-McNally's failure to give notice of a suit against the governmental entity itself. *See* Compl. ¶¶ 29–34. In considering whether to impose an equitable override to the statute, the degree of unfairness engendered by allowing a state employee to create the impression that he acted on his own and then "profit" from his governmental status is significantly greater than that which would be presented here. *Cf. Town of New Chicago,* 939 N.E.2d at 653 (noting that the core moral intuition at the heart of estoppel is that "one who by deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other").

Second, neither *Gregor* nor *Baker* applied the three-pronged Indiana standard for equitable estoppel—one that was reaffirmed most recently by *Schoettmer* and has a lengthy pedigree in the courts of the state. *See Story Bed & Breakfast,* 819 N.E.2d at 67; *City of Crown*

---

[15] In addition to being "unjust," the *Baker* court reasoned that a contrary holding "would create distasteful incentives for plaintiffs to file suit immediately after [an] accident—before thorough investigation or manifestation of all injuries—in order to learn of an ITCA defense in time to file a notice of tort claim and seek voluntary dismissal of the suit without prejudice." 992 F. Supp. at 174. We agree that an estoppel standard, if it does not strike the correct balance, might indeed create perverse incentives. It is for the Indiana courts to strike that balance, however, and it is not our role to engage in common-law policymaking.

*Point,* 510 N.E.2d at 687; *Damler v. Blaine,* 51 N.E.2d 885, 889 (Ind. 1943). Both decisions mentioned the term "estoppel," but neither set forth a definition by which they understood the term. *Gregor* approached the closer of the two to announcing a standard—that estoppel may apply if a state employee "acts in a manner which disguises or fails to reveal his status" and "the plaintiff actually and reasonably lacks knowledge." 706 N.E.2d at 243. This is not, however, equivalent to the more rigorous three-part standard that *Schoettmer* declared necessary for satisfying the elements of equitable estoppel, and both *Baker* and *Gregor* make clear that their results were dictated by a more holistic approach to the equitable question. The late Judge Dillin of this Court, who authored the language of *Baker* upon which *Gregor* later relied so heavily, forthrightly disclosed the inchoate grounds of his reasoning: "[W]e think that such ignorance in this case can prevent the use of the ITCA as a bar to this suit. Whether we characterize this as *some kind of waiver or estoppel* conclusion or as a *special exception* to the ITCA is not overly important." 922 F. Supp. at 173 (emphasis added).[16]

Here, the keystone of Defendant's first affirmative defense is its assertion that the ITCA's 180-day notice deadline did not apply because estoppel would have barred Hoosier Uplands from relying on the statutory provision. *See* Docket No. 63 at 9. The Indiana Supreme Court has stated, in a decision issued last year, that "the party claiming equitable estoppel *must*" satisfy the three-part standard we have applied above, *Schoettmer,* 992 N.E.2d at 709 (emphasis added); in doing so, it never mentioned either *Gregor* or *Baker,* despite those decisions' strongly analogous facts. Where faced with two strands of precedent that differ in both posture and governing standard, we feel compelled to confine our treatment of the issue to the bounds established by the

---

[16] It should be noted, of course, that the Southern District of Indiana lacks authority to create a "special exception" to an Indiana statute on equitable grounds. The court in *Baker* should have been more precise in stating the basis for its holding, given that it, and we, are constrained to apply, rather than create, Indiana law.

Indiana Supreme Court, which has spoken more specifically and recently on the issue and whose interpretations of state law we treat as authoritative.

## B. Defendant's additional arguments

In addition to its principal argument for estoppel, Defendant's response to Plaintiff's summary judgment motion presents a cursory argument that the ITCA's 180-day notice deadline "may" not have elapsed in April 2009 because Larry Mills was legally incompetent for part of that period.[17] In Defendant's words, "there is evidence (most notably the preparation of a of attorney document) [sic] that Larry Mills was incompetent for part of all of the term of PWR's [sic] representation of him. If this is the case, then the statute of limitations and/or ITCA notice period could have been tolled." Docket No. 58 at 19.

Defendant's argument is, to understate matters, unconvincing. It presents no factual evidence at all (its incomprehensible parenthetical citation notwithstanding), and the only authority it cites is an Indiana Code provision relating to *statutes of limitations*, not the ITCA notice period. *See* Docket No. 19 at 18 (citing Ind. Code § 34-11-6-1). A "nonmovant will not defeat summary judgment merely by pointing to self-serving allegations without evidentiary support." *See, e.g., Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1073 (S.D. Ind. 1995) (citing *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis,* 42 F.3d 403, 408 (7th Cir. 1994)). Defendant has provided us no evidence in support of his claim that Mills was legally incompetent for any period long enough that it could have bolstered its claim that PWR shares responsibility for failing to meet the ITCA notice deadline. Indeed, Hausmann-McNally's own case notes reflect that Mills, after suffering severe injuries as a result of the accident, had regained his faculties and was capable of conversing on the phone with Hausmann-McNally

---

[17] Defendant never mentions this argument in its brief in support of its own motion for summary judgment. *See* Docket No. 63.

attorneys by January 2009—still well more than six months before PWR became involved in the matter. Pl.'s Ex. 8 at 11–12 ("Spoke w/ [client]. Larry said he is feeling much better."). Because it is entirely without legal or factual support, Defendant's argument regarding Mills's "incompetence" or "disability" is unavailing.

Defendant makes another, more subtle, contention in opposition to Plaintiff's motion for summary judgment. It suggests:

> Even if at some point, someone (PWR, in [Hausmann-McNally's] estimation) should have determined whether Brooking [Nelson] was acting in the scope of her employment when she was involved in the accident, it does not follow that H-M was required to make such a determination within the first 180 days. *This is why the nonparty defense remains viable as to PWR.* If the Plaintiff is correct about H-M's obligations within the first 180 days, even when the basic facts of the accident do not give rise to an inkling of governmental employment, then the standard or care for personal injury suits would practically require filing suit almost immediately when there is any reasonable chance of a jury verdict in excess of a driver's policy limits.

Docket No. 58 at 14–15 (emphasis added). We do not necessarily disagree with any of Defendant's assertions. But Defendant is getting ahead of itself. The language we have excerpted above is an argument that Hausmann-McNally should not be held liable for legal malpractice, rather than an objection to the applicability of the ITCA's notice bar. The standards governing equitable estoppel and attorney negligence in this context are not precise mirror images, though they inevitably resonate with one another to some extent. We have concluded that the ITCA would have barred any suit against Hoosier Uplands for which notice was not provided within 180 days of Plaintiff's injury; this does *not* necessarily compel the conclusion that Hausmann-McNally committed legal malpractice in its failure to provide such timely notice. *See Godby v. Whitehead,* 837 N.E.2d 146, 151 (Ind. Ct. App. 2005) (enumerating the elements of a legal malpractice claim in Indiana). It may well be that PWR's conduct with respect to this issue was just as inattentive as was Hausmann-McNally's, but that question is not before us: Defendant has

not argued that PWR somehow owed Mills a duty to bring a claim against Hoosier Uplands after October 2009, even if it was time-barred, and such an argument would almost surely be futile. Docket No. 58 at 2. *See also Roberts v. Heilgeist,* 465 N.E.2d 658, 661 (Ill. App. Ct. 1984) (collecting cases, observing that an attorney owes no duty to a client to prosecute a time-barred claim). The malpractice for which the first affirmative defense claims PWR shares responsibility was complete once the notice period elapsed, and it elapsed before PWR was involved in this case.[18]

Plaintiff's burden here is straightforward. He need point only to the statutory command that notice of tort suits against state entities must be brought within 180 days of loss; he has done that, and thus has made out a prima facie case that PWR as a non-party cannot share in any malpractice liability. Defendant's burden is heavier. Hausmann-McNally bears the burden not only of establishing the elements of its affirmative defense as a general matter, *see Huber v. Henley,* 656 F. Supp. 508, 511 (S.D. Ind. 1987) (noting that "the burden of proof of a nonparty defense is on the defendant"), but also of proving that estoppel could override the ITCA's notice provision, and that "clear evidence" warrants an exception to the general rule that equitable estoppel will not be applied against government entities. *See Story Bed & Breakfast,* 819 N.E.2d at 67 ("The State will not be estopped in the absence of clear evidence that its agents made

---

[18] Even if Defendant were to prevail on its estoppel argument and its other arguments regarding the scope of PWR's duty, it would still have to show that PWR violated its duty of care in a manner that rendered it equally or solely culpable for the injury suffered by Plaintiff: the loss of opportunity to recover from Hoosier Uplands. Defendant has put forth no evidence—other than its own argument in its briefing, which we have excerpted above—that could establish PWR's negligence. Indeed, since the crux of its case for the first affirmative defense is that Nelson and Hoosier Uplands were so culpable in concealing their identity that they would be estopped from asserting an ITCA defense, and there is no evidence that either Nelson or Hoosier Uplands did anything else to disclose their status in the lengthy period between April 2009 and Nelson's 2012 deposition, it is difficult to fathom how Defendant would go about making the case that PWR was negligent *after* April 2009 while Hausmann-McNally was not *before* April 2009. It is not impossible, as Defendant's brief suggests, that it became negligent not to investigate Nelson's status as the statute of limitations approached nearer—notwithstanding Nelson and Hoosier Upland's continued failure to disclose their status—but Defendant would have to do significantly more to withstand summary judgment on the question. *See* Docket No. 58 at 14–15.

representations upon which the party asserting estoppel relied."). Defendant has not met this burden; its failure to create a factual issue with respect to its failure to meet the ITCA notice deadline forecloses its first affirmative defense as a matter of law.

## <u>Conclusion</u>

This Order does not mark the first time we have touched upon the central issue raised in Defendant's first affirmative defense. In fact, it is the third. In our order dismissing Defendant's third party claims, we observed:

> The thrust of Plaintiff's malpractice suit is that Hausmann-McNally negligently allowed the ITCA notice period of 180 days to elapse, thus permanently barring Plaintiff from recovering against the state agency that employed Ms. Nelson. That alleged negligence was complete—and its effects irrevocable—more than six months before PWR was hired as co-counsel; no subsequent acts or omissions of PWR as co-counsel could add to or detract from the prejudice allegedly suffered by Plaintiff as a result of that negligence.

Docket No. 69 at 13. On the same day, we dismissed Defendant's motion to disqualify counsel, discussing in some detail the standard for equitable estoppel enunciated in *Schoettmer v. Wright*, and we reasoned:

> [T]o shift the onus of potential malpractice liability onto PWR, Defendant would have to show that its failure to provide ITCA-compliant notice was done in subjective ignorance of the need for such notice, and in reliance upon a misrepresentation by a state employee. As PWR has demonstrated, Defendant was neither subjectively ignorant nor acting in reliance upon any misleading communications from the state.

Docket No. 70 at 12 (citations omitted).

In both prior rulings, our discussion of Defendant's equitable estoppel claim was intertwined to some degree with our resolution of other issues, and we never addressed the question squarely. We do so now, and we conclude that equitable estoppel would not have overridden the ITCA notice period, which in this case lapsed in April 2009. As we have previously discussed and Defendant concedes, PWR—which became involved only in October

2009—cannot have owed Plaintiff a duty of care with respect to a time-barred claim against a state agency. Our resolution of Defendant's estoppel claim thus renders its other arguments regarding the scope of PWR's representation immaterial, since PWR could have committed the malpractice in question "only if it was possible for PWR to have made a claim against [Nelson] . . . after the passage of 180 days." Docket No. 58 (Def.'s Resp.) at 2.

For the foregoing reasons, we GRANT Plaintiff's motion for partial summary judgment on Defendant's first affirmative defense, and we DENY Defendant's motion for partial summary judgment on the same claim.[19]

IT IS SO ORDERED.

Date: _____9/24/2014_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[19] Defendant's motion and brief do not explicitly seek summary judgment on its first affirmative defense. Rather, Defendant announces in its brief that it seeks partial summary judgment on the issues which underlie the affirmative defense. Defendant explains what it seeks as follows:

> [T]here are several inescapable realities: first, PWR did not effectively limit its representation of the Plaintiff/Larry Mills and therefore did owe Larry Mills a duty of care as to the entirety of the litigation; second, Hannah Brooking and/or her employer would have been estopped from relying upon the ITCA had they been sued within the statute of limitations; third the claim against Hannah Brooking was not settled at the time that PWR began its representation of Larry Mills. Because these issues are established as a matter of law, H-M is entitled to partial summary judgment on these issues, and to a determination that PWR owed Larry Mills and the Plaintiff a duty of reasonable care as to the claim against Hannah Brooking and/or her employer.

Docket No. 63 at 2. We have ruled against Defendant on the second "issue" it lists above, which thus compels our determination that PWR did *not* owe Larry Mills and the Plaintiff a duty of reasonable with respect to a possible suit against Hannah Nelson's employer. We have not expressly ruled on the first and third issues Defendant presents above, because they are rendered irrelevant to our disposition of this motion.

Distribution:

Neil Andrew Davis
LEBLANC NETTLES DAVIS
neil@indianalawgroup.com

John W. Mervilde
MEILS THOMPSON DIETZ & BERISH
jmervilde@meilsattorney.com

Rick D. Meils
MEILS THOMPSON DIETZ & BERISH
rmeils@meilsattorney.com

James  Piatt
PRICE WAICUKAUSKI & RILEY
jpiatt@price-law.com

Joseph N. Williams
PRICE WAICUKAUSKI & RILEY
jwilliams@price-law.com

William N. Riley
PRICE WAICUKAUSKI & RILEY
wriley@price-law.com